UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION, as successor to Wells Fargo Bank, National Association, as Trustee for the Registered Holders of Citigroup Commercial Mortgage Trust 2007-C6, Commercial Mortgage Pass-Through Certificates, Series 2007-C6, acting by and through Its Special Servicer CWCapital Asset Management LLC,<br><br>Plaintiff,<br><br>v.<br><br>BANK OF AMERICA, N.A.,<br><br>Defendant. | Case No.: |

## COMPLAINT

Plaintiff U.S. Bank National Association, as successor to Wells Fargo Bank, National Association, as Trustee for the Registered Holders of Citigroup Commercial Mortgage Trust 2007-C6, Commercial Mortgage Pass-Through Certificates, Series 2007-C6 (the "Trust"), acting by and through its Special Servicer CWCapital Asset Management LLC ("CWCAM"), files this Complaint against Defendant Bank of America, N.A., successor by merger to LaSalle Bank National Association, and in support thereof alleges as follows:

## PARTIES

1.   U.S. Bank National Association is the Trustee for the Registered Holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates Series 2006-C24.  U.S. Bank National Association is a nationally chartered bank and is a citizen

of the State of Ohio because that is the state in which it has its main office as specified in its Articles of Association.

2. Defendant Bank of America, N.A. ("BofA") is a nationally chartered bank and is a citizen of the State of North Carolina because that is the state in which it has its main office as specified in its Articles of Association.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 exclusive of interest and costs, and complete diversity of citizenship exists between the parties.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

5. On or about July 25, 2007, LaSalle Bank National Association ("LaSalle") and Citigroup Commercial Mortgage Securities Inc. ("CCMSI") executed a Mortgage Loan Purchase Agreement (the "MLPA"), providing for the sale of certain commercial mortgage loans (the "Series 2007-C6 Loan Pool") from LaSalle to CCMSI.[1]

6. The MLPA states that the mortgage loans comprising the Series 2007-C6 Loan Pool and sold to CCMSI would be deposited into a trust fund (the "Trust"), the beneficial ownership of which would be evidenced by various classes of mortgage pass-through certificates ("Certificates"), and that one or more real estate mortgage investment conduit elections would be made with respect to the Trust.[2]

7. LaSalle intended that the Trust would be created and the Certificates would be issued pursuant to a Pooling and Servicing Agreement (the "PSA") dated as of July 1, 2007. The

---

[1] On or about October 17, 2008, BofA became successor-by-merger to LaSalle.
[2] The holders of the Certificates are referred to as "Certificateholders."

PSA provides that Wells Fargo Bank, N. A. would serve as the initial trustee for the Trust and CWCAM would serve as the Special Servicer for the Trust.

8. One of the loans included in the Series 2007-C6 Loan Pool was a loan made by LaSalle to Women's Physicians Group, LLP ("WPG" or "Borrower"), as evidenced by a Promissory Note ("Note") in the original principal amount of Nine Million and 00/100 Dollars ($9,000,000.00) (the "Loan").

9. Repayment of the Loan is secured by, among other things, a two-story commercial building located at 8081 Township Line Road, Indianapolis, Indiana 46237 (the "Property"), which is encumbered by that certain Mortgage, Security Agreement and Fixture Filing (the "Mortgage") executed by WPG in favor of LaSalle and dated as of April 30, 2007. The Note, Mortgage and all other documents executed in connection with the Loan are collectively referred to herein as the "Loan Documents."

10. The Trust became the holder and owner of the Loan Documents pursuant to a series of assignments: first, from LaSalle to Wells Fargo Bank, N.A. as trustee for the Trust; second, from Wells Fargo Bank, N.A. to U.S. Bank National Association as trustee for the Trust.

11. The Loan was made to WPG for the purpose of refinancing existing debt related to the Property.

*The Acquisition of the Property*

12. In December 1999, WPG purchased the Property for $3,512,500.00 from Galen Hospital Corporation, Inc.

13. St. Vincent Hospital (the "Hospital") is the successor in interest to Galen Hospital Corporation, Inc.

14. The Property sits on the campus of the Hospital in Indianapolis.

15. WPG does not own the parking lot that serves the Property. The Hospital owns the lot.

16. In connection with the acquisition of the Property, WPG executed a Special Warranty Deed (the "Deed"), dated December 16, 1999, which contains title exceptions that run with the Property.

17. Paragraph 1 of the Deed contains a use restriction (the "Use Restriction") that provides in relevant part:

> The Property/Real Estate may be used and occupied only for an ambulatory surgery center and medical offices for the private practice of medicine and for no other purposes without the prior written consent of "Hospital" (as defined below), which consent may be withheld in Hospital's sole discretion. In particular, without limiting the generality of the foregoing, the following uses shall not be permitted on the Property/Real Estate: (a) an acute care hospital, medical or surgical or specialty hospital, (b) a facility providing birthing services, (c) a facility providing outpatient psychiatric services (other than services of a psychologist), (d) a facility providing "Ancillary Medical Services of Facilities" (as defined herein). . . . As used herein, "Ancillary Medical Services or Facilities" shall mean (1) any form of testing for diagnostic or therapeutic purposes (including, but not limited to, preoperative or postoperative ancillary or diagnostic testing), provision or operation of a laboratory (including, without limitation, a pathology laboratory or a clinical laboratory), diagnostic imaging services (which include, without limitation, the following testing facilities: fluoroscopy, x-ray, plan film radiology, computerized tomography (CT) ultrasound, radiation therapy, mammography and breast diagnostics, nuclear medicine testing and magnetic resonance imaging), physical therapy services, or respiratory therapy service, (2) the provision of any medical or related service to or for any person that is in addition to the examination and diagnosis of patients performed directly by a Physician or by other health care professionals under the direct supervision of a Physician, or a facility operated for the provision of any such service, and (3) engaging in the business of dispensing of pharmaceutical services or a pharmacy. . . .

18. Paragraph 3 of the Deed contains a right of first refusal (the "Right of First Refusal") that provides in relevant part:

> (a) If the owner of the Property/Real Estate (the "Owner") shall receive a bona fide offer from any third party for the purchase, acquisition or lease (for a term of more than fifteen (15) years) of the Property/Real Estate or any part thereof

or interest therein, which offer the Owner desires to accept, or if Owner desire to sell or transfer or make a bona fide offer to sell, transfer or assign the Property/Real Estate or any part thereof or interest therein to a third party, Owner shall promptly deliver to Galen Hospital Corporation, Inc. (the "Grantor") . . . a written notice setting forth the full terms and conditions of the proposed transaction, and if available, a copy of such offer, in the case of a purchase or other transfer, or a copy of the proposed lease agreement, in the case of a lease or an assignment of any interest of Owner.  Grantor may, within 30 days after receipt of such notice, elect to purchase, acquire or lease the Property/Real Estate or such portion thereof or interest therein which is subject to any offer as described above (the "Offer Property") on the same terms and conditions as those set forth in such notice.  The failure of Grantor to exercise this right of first refusal with respect to any proposed sale, lease, or other transfer by any Owner shall not result in termination of the right of first refusal with respect to the Property/Real Estate or any portion thereof or interest therein sold, leased, transferred, or assigned but this right of first refusal shall be a continuing right binding upon such Owner and all future Owners with respect to all subsequent proposed sales, leases, transfers, or assignments of the Property/Real Estate or any portion thereof or interest therein. . . .

19.     The Loan made by LaSalle to WPG was a cash-out refinance in which WPG received at least $3.4 million in unrestricted cash from LaSalle at the time of Loan closing.

20.     WPG did not invest any cash in connection with the refinancing.

### *The Property and Loan Default*

21.     The Property is located within the Hospital's campus, and is connected to St. Vincent Women's Hospital.  The first floor of the Property is a surgical center and the second floor consists of offices.

22.     The Property's major tenant, Women's Physician Surgery Center, LLC (the "Surgery Center"), which occupied 55% of the space available, vacated the Property in April 2012, eight years before its lease expired.  ***The Surgery Center was partially owned by the Hospital.***

23.     The Surgery Center's use of the Property optimized its value.  The Surgery Center operated the first floor space as it was intended and for which the Property is outfitted – an

ambulatory surgery center – but the provision of most other services is prohibited by the Use Restriction.

24.     The Property can only be used and occupied as an ambulatory surgery center and medical offices for the private practice of medicine and for no other purpose without consent from the Hospital, which the Hospital can withhold at its discretion for any reason.

25.     The following uses of the Property are prohibited by the Use Restriction: an acute care hospital, medical or surgical or specialty hospital; a facility providing birthing services; a facility offering outpatient psychiatric services; a facility providing outpatient rehabilitation services; a facility providing nursing services; or a facility providing Ancillary Medical Services, which includes, among other things, diagnostic imaging services, laboratory services, physical therapy services, or pharmaceutical services.

26.     After the Surgery Center vacated the Property, WPG attempted to secure a tenant that could replicate the Surgery Center's cash flow and optimize the surgical design of the first floor of the Property. WPG was unable to find a new tenant and began making partial payments on the Loan during the summer of 2012.

27.     The Loan went into default in August 2012. In October 2012, the Loan was transferred to CWCAM for special servicing due to the uncured monetary default.

28.     On December 13, 2012, the Trust commenced a foreclosure action against WPG in Indiana state court. In March 2013, the state court entered an order appointing DTM Real Estate Services, LLC (the "<u>Receiver</u>") as receiver for the Property.

29.     Like WPG, the Receiver was unable to find a suitable tenant replacement for the Surgery Center due to the unreasonably broad and prohibitive Use Restriction. Additionally, the Use Restriction has severely limited the Receiver's ability to convey the Property to a third party.

30. On or about March 10, 2014, the Receiver requested from the Hospital a general release from, or modification to, the Use Restriction. The Hospital refused to waive the Use Restriction or to modify it to make it less restrictive.

31. Thereafter, on or about April 16, 2014, the Receiver asked the Hospital to permit twenty-three (23) identified uses on the Property. The Hospital responded by stating that it intended to maintain and enforce the Use Restriction as presently written and refused to consent to the uses requested by the Receiver which were prohibited by the Use Restriction.

32. The Hospital simply will not permit the Property to be used in any manner that competes with the services that it provides.

33. The Hospital has no interest in acquiring the Property.

### *The Representations and Warranties in the MLPA*

34. Pursuant to the MLPA, LaSalle made representations and warranties (each a "Representation") regarding the Loan to CCSMI and to the Trustee for the benefit of the Certificateholders, including among others, Representation No. 8:

> Each related Mortgage is a valid and enforceable first lien on the related Mortgaged Property subject only to the exceptions and limitations set forth in representation (5) above and the following title exceptions . . . (b) covenants, conditions and restrictions, rights of way, easements and other matters of public record, none of which, individually or in the aggregate, materially and adversely interferes with the current use of the Mortgaged Property or the security intended to be provided by such Mortgage or with the Mortgagor's ability to pay its obligations under the Mortgage Loan when they become due or materially and adversely affects the value of the Mortgaged Property, . . . .

35. Pursuant to Section 2.01(a) of the PSA, CCMSI, as the Depositor of the Series 2007-C6 Loan Pool into the Trust, assigned all of its rights under the MLPA to the Trustee for the Trust.

7

36. The Use Restriction and the Right of First Refusal are contrary to Representation 8(b) of the MLPA.

37. BofA's violation of the Representation has had a material and adverse impact on the value of the Loan or on the interests of the Certificateholders.

38. The Use Restriction has prevented the Receiver from securing a suitable replacement tenant for the Property or repositioning the Property, and has severely limited to whom it can convey the Property.

39. Additionally, the perpetual Right of First Refusal encumbers the Property and will continue to encumber it even through a foreclosure sale. Through the Right of First Refusal, the Hospital maintains control over any sale or lease (in excess of 15 years) of the Property, which impacts the security intended to be provided to the Trust (and any subsequent assignees) by the Mortgage.

40. The Trust incurred monthly payments that had to be advanced, interest on those advances and property protection advances to cover operational expenses, and costs of foreclosure litigation against WPG, litigation against the Surgery Center, and this current litigation.

41. On or about October 18, 2013, CWCAM, in its capacity as Special Servicer for the Trust, gave written notice to the parties to the PSA, including BofA, Wells Fargo, CCMSI and the applicable rating agencies, of BofA's violation of the foregoing Representation that materially and adversely affected the value of the Loan or the interests of Certificateholders.

42. Pursuant to Section 3(c) of the MLPA and Section 2.03(a) of the PSA, CWCAM requested that BofA either cure the violation or repurchase the Loan for the Purchase Price (as defined in the PSA) within ninety (90) days.

43. In Section 3(c) of the MLPA, BofA covenanted in relevant part that:

> If the Seller receives, pursuant to Section 2.03(a) of the [PSA], written notice of a…Document Defect or a Breach relating to a Mortgage Loan, and if such Document Defect or Breach shall materially and adversely affect the value of the applicable Mortgage Loan or the interests of the Certificateholders therein, then the Seller shall, not later than 90 days from receipt of such notice…, cure such Document Defect or Breach, as the case may be, in all material respects, or, if such Document Defect or Breach … cannot be cured within such 90-day period, (i) repurchase the affected Mortgage Loan at the applicable Purchase Price not later than the end of such 90-day period….

44. Section 2.03(a) of the PSA provides in relevant part that:

> if any party hereto determines that such Document Defect or Breach materially and adversely affects the value of the affected Mortgage Loan, the interest of the Certificateholders therein…the applicable [Special Servicer] shall…request in writing…that the applicable Mortgage Loan Seller, not later than 90 days from receipt of such written request…(i) cure such Document Defect or Breach, as the case may be, in accordance with Section 3 of the applicable Mortgage Loan Purchase Agreement, (ii) repurchase the affected Trust Mortgage Loan in accordance with Section 3 of the applicable Mortgage Loan Purchase Agreement….

45. Section 3(f) of the MLPA provides that BofA's obligation to cure or repurchase the Loan is the sole remedy available to the Trust regarding any violation of a Representation that results in a material and adverse impact to the Trust.

46. Likewise, Section 2.03(d) of the PSA states that the MLPA provides the sole remedies available to the Trust regarding any violation of a Representation that results in a material and adverse impact to the Trust.

47. In response to CWCAM's notice, BofA declined any responsibility for the Loan or to the Trust.  BofA has refused to cure or repurchase the Loan during the provided ninety (90) day cure period in breach of the MLPA.

48. By letter dated May 16, 2014, the Trust reiterated to BofA that at least one of the Representations given on account of the Loan had been violated and that such violation had

9

caused a material and adverse effect on, among other things, the value of the Loan. The Trust also advised BofA of the Hospital's refusal to waive or modify the Use Restriction and to consent to the specific uses identified by the Receiver. The Trust once again requested that BofA uphold its contractual obligation to cure or repurchase the Loan.

49. BofA did not respond to the Trust's May 16, 2014 letter.

50. All conditions precedent to the filing of this suit have been satisfied.

## COUNT I
### (SPECIFIC PERFORMANCE)

51. The Trust incorporates by reference the allegations in paragraphs 1 through 50 above is if fully restated herein.

52. Pursuant to Section 3(c) of the MLPA and Section 2.03 of the PSA, BofA is required to cure its violation of the representations and warranties regarding the Loan that resulted in a material and adverse impact or repurchase the Loan for the Purchase Price (as defined in the PSA) within ninety (90) days of receiving notice of the violation.

53. BofA received notice of the violation of the representations and warranties regarding the Loan that resulted in a material and adverse effect on or about October 18, 2013, and again on or about May 16, 2014, but has refused to cure or repurchase the Loan.

54. BofA has breached Section 3(c) of the MLPA and Section 2.03 of the PSA because it has refused to cure or repurchase the Loan within ninety (90) days of receiving notice of its violation of the representations and warranties contained in the MLPA which had a material and adverse impact.

55. According to Section 3(f) of the MLPA and Section 2.03(d) of the PSA, BofA's cure of the violation or repurchase of the Loan are the exclusive remedies provided for a

violation of the representations and warranties contained in the MLPA which result in a material and adverse impact on the value of the Loan or the interests of the Certificateholders.

56. Because BofA's opportunity to cure has expired, the Trust is entitled to specific performance of BofA's contractual obligation to repurchase the Loan for the Purchase Price (as defined in the PSA).

57. The Trust demands specific performance of BofA's contractual obligation to repurchase the Loan for the Purchase Price (as defined in the PSA).

## COUNT II
### (BREACH OF CONTRACT / DAMAGES)

58. The Trust incorporates by reference the allegations contained in paragraphs 1 through 57 of this Complaint as if fully set forth herein.

59. BofA violated the representations and warranties contained in the MLPA as described herein and such violation resulted in a material and adverse impact on the value of the Loan or the interests of the Certificateholders.

60. Pursuant to Section 3(c) of the MLPA and Section 2.03 of the PSA, BofA is required to cure its violation of the representations and warranties regarding the Loan or repurchase the Loan for the Purchase Price (as defined in the PSA) within ninety (90) days of receiving notice of the violation.

61. BofA received notice of the violation of the representations and warranties regarding the Loan on or about October 18, 2013, and again on or about May 16, 2014, but has refused to cure the violation or repurchase the Loan.

62. BofA has breached Section 3(c) of the MLPA and Section 2.03 of the PSA because it has refused to cure or repurchase the Loan within ninety (90) days of receiving notice

of its violation of the representations and warranties contained in the MLPA which had a material and adverse impact.

63. Because of BofA's violations of the representations and warranties and its obligation to cure or repurchase the Loan within ninety (90) days, the Certificateholders have suffered damages measured by the Purchase Price (as defined in the PSA) to include the outstanding principal balance of the Loan, together with all accrued and unpaid interest on the Loan at the Mortgage Rate (as defined in the PSA) plus any accrued interest on P&I Advances (as defined in the PSA); all unreimbursed Servicing Advances (as defined in the PSA) plus any accrued and unpaid interest thereon; the unpaid Liquidation Fee (as defined in the PSA); any reasonable costs and expenses incurred by, among others, the Trust; and any other Additional Trust Fund Expense (as defined in the PSA).

64. On behalf of all Certificateholders, the Trust demands judgment against BofA for damages in an amount to be determined at trial, but not less than $11,444,743.55 plus the Liquidation Fee, prejudgment interest, post-judgment interest, attorneys' fees, costs and other amounts which continue to accrue as part of the Purchase Price (as defined in the PSA).

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff U.S. Bank National Association, as successor to Wells Fargo Bank, National Association, as Trustee for the Registered Holders of Citigroup Commercial Mortgage Trust 2007-C6, Commercial Mortgage Pass-Through Certificates, Series 2007-C6, acting by and through its Special Servicer CWCapital Asset Management LLC, prays that the Court award judgment in its favor against Defendant Bank of America, N.A., and requests that this Court award the following relief:

(a) as to Count I, enter an order of specific performance requiring BofA to promptly repurchase the Loan at the Purchase Price as that term is defined in the PSA;

(b) as to Count II, awarding Plaintiff money damages in an amount to be determined at trial, but not less than $11,444,743.55, plus the Liquidation Fee, prejudgment interest, post-judgment interest, attorneys' fees, costs and other amounts which continue to accrue as part of the Purchase Price;

(c) awarding Plaintiff the costs and disbursement of this proceedings, including reasonable attorneys' fees; and

(d) granting such other and further relief to Plaintiff as this Court deems just, proper and equitable.

Dated: September 12, 2014             Respectfully submitted,

/s/ Christopher C. Hagenow
Christopher C. Hagenow, Atty. No. 16730-49
David M. Bullington, Atty. No. 26718-49
BLACKWELL, BURKE & RAMSEY, P.C.
111 Monument Circle, Suite 452
Indianapolis, Indiana 46204
T: (317) 635-5005
F: (317) 634-2501
chagenow@bbrlawpc.com
dbullington@bbrlawpc.com

VENABLE LLP
Gregory A. Cross (*pro hac vice* pending)
Colleen M. Mallon (*pro hac vice* pending)
John V. Sunder (*pro hac vice* pending)
750 East Pratt Street, Suite 900
Baltimore, Maryland 21202
T: (410) 244-7400
F: (410) 244-7742
gacross@venable.com
cmmallon@venable.com
jvsunder@venable.com

*Counsel for Plaintiff*